UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | |
|---|---|
| **WALKER & SONS, INC.** | **CIVIL ACTION NO. 6:09-cv-1822** |
| **VERSUS** | **JUDGE HAIK** |
| **PUNCH YA DADDY, LLC et al** | **MAGISTRATE JUDGE HILL** |

## MEMORANDUM IN OPPOSITION
## TO MOTION IN LIMINE

**May it Please the Court**:

Defendants, **Punch Ya Daddy, L.L.C.** and **Kirby Falcon**, have filed a "Motion in Limine" (Rec. Doc. 75) and accompanying Memorandum (Rec. Doc. 75-1) which seeks to exclude from evidence the report and testimony of Kirsty Nunez of Focus Research, survey expert for Plaintiff, **Walker & Sons, Inc**.

In opposition, Plaintiff respectfully submits this Memorandum. Because trial in this matter is scheduled to begin February 6, 2012, Defendants' Motion has been referred to chambers by notice of the Court (Rec. Doc. 76).

# **TABLE OF CONTENTS**

**A. Introduction** .................................................................................................... 1

**B. Defendants' own criticisms fall short of *Daubert*'s requirements** ..................................................................................................... 1

    **1. Background of Focus Research study** ................................................... 2

    **2. Gabriel Gelb's own analysis does not satisfy the *Daubert* factors for reliable and relevant testimony** ..................................................... 2

    **3. Gabriel Gelb's long history of litigation work has resulted in questionable commentary on his expertise** ............................................... 6

    **4. Gabriel Gelb's testimony is internally contradictory** ................................... 6

**C. Focus Research's survey and conclusions do pass *Daubert* muster** ................................................................................................... 7

    **1. Focus Research's sample of grocery shoppers included the appropriate population** ............................................................... 8

    **2. The Focus Research survey and its questions were not leading, and Gabriel Gelb's report actually misquotes the survey** ....................................................................................... 11

    **3. According to authorities cited by Defendants' own expert, no control group was appropriate for the Focus Research survey** ................................................................................. 13

**D. Despite any purported methodological flaws in Focus Research's survey, such bear on the weight, not the admissibility, of survey evidence** ................................................................. 13

# **TABLE OF AUTHORITIES**

**Cases*:***

*Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 264
(C.A.5, 1980) .................................................................................................................. 9

*C.A. May Marine Supply Co. v. Brunswick Corp.*, 649 F.2d 1049
(C.A.5, 1981) ................................................................................................................ 13

*Dallas Cowboys Football Club, Ltd. v. America's Team Properties, Inc.*,
616 F.Supp.2d 622, 641 (N.D. Texas, 2009) .................................................................. 6

*Daubert v. Merrill Dow Pharms.*, 509 U.S. 579 (1993) ................................................... 1

*General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) .................................................. 5

*Gray ex rel. Rudd v. Beverly Enterprises-Mississippi, Inc.*, 390 F.3d 400,
408 at FN7 (C.A.5, 2004) ............................................................................................... 6

*Hodges v. Mack Trucks Inc.*, 474 F.3d 188, 194 (C.A.5, 2006) ...................................... 2

*Holiday Inns, Inc. v. Holiday Out in America*, 481 F.2d 445, 447
(C.A.5, 1973) ................................................................................................................ 13

*Honestech, Inc. v. Sonic Solutions*, 430 Fed. Appx. 359, 361 (C.A.5, 2011) ............... 11

*Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (C.A.5, 2007) ............................. 1

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) ............................................ 3

*Medi-Flex, Inc. v. Nice-Pak Products, Inc.*, 422 F.Supp.2d 124,
1252 (D.Kansas, 2006) ................................................................................................... 6

*Moore v. Ashland Chemical Inc.*, 151 F.3d 269, 277 (C.A.5, 1998) ............................... 5

*National Western Life Ins. Co. v. Western Nat. Life Ins. Co.*,
2011 WL 692976 (W.D.Texas 2011) (slip. op.) ........................................................... 14

*Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477 (C.A.5 2004) ................ 10, 11

*Sno-Wizard Mfg., Inc. v. Eisemann Products Co.*, 791 F.2d 423
(C.A.5, 1986) .......................................................................................................... 10, 11

*Tiger Direct, Inc. v. Apple Computer, Inc.*, 2005 WL 1458046
(S.D.Fla., 2005) .............................................................................................................. 6

*U.S. v. 14.38 Acres of Land, More or Less Situated in
Leflore County, State of Miss.*, 80 F.3d 1074, 1078 (C.A.5, 1996) .............................. 14

**Statutes and Rules:**

Federal Rule of Evidence 702 ................................................................................................ 1

Fifth Circuit Rule 28.7 ........................................................................................................ 11

Federal Rule of Appellate Procedure 32.1 ......................................................................... 11

Fifth Circuit Rule 47.5 ........................................................................................................ 11

A. <u>Introduction</u>

"… opponents' arguments included relevant population, claims of biased questions, size of sample, and so on. These are the typical objections raised by those questioning the credibility of any survey introduced by an opponent…" – Gelb, Gabriel M. et al, "Internet Surveys for Trademark Litigation," *The Trademark Reporter*, September-October 2007

B. <u>Defendants' own criticisms fall short of *Daubert*'s requirements</u>

For a motion which never cites *Daubert*[1], Defendants borrow plenty of its terminology. Gabriel Gelb, according to Defendants, was hired to "evaluate the methodology of the Focus Research survey and its reliability" (Rec. Doc. 75-1, p. 2). And Defendants' Motion, which draws exclusively on Mr. Gelb's report, unequivocally levels a *Daubert* criticism: "Reliability is determined by assessing whether the reasoning or methodology underlying the testimony is scientifically valid." *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (C.A.5, 2007).

Since there is no doubt that Defendants' Motion invokes Federal Rule of Evidence 702, as interpreted by *Daubert*, Plaintiff respectfully submits that Mr. Gelb's own opinions (as sole source of Defendants' allegations) must first pass this Court's same scrutiny.

Rule 702, as amended in response to *Daubert*, allows "an expert by knowledge, skill, experience, training or education" to render opinion testimony if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

---

[1] *Daubert v. Merrill Dow Pharms., Inc.*, 509 U.S. 579 (1993)

In short, *Daubert* "assigned the trial court a gatekeeper role to ensure [expert] testimony is both reliable and relevant." *Hodges v. Mack Trucks Inc.*, 474 F.3d 188, 194 (C.A.5, 2006). Examination of Mr. Gelb's report, on which Defendants' Motion exclusively relies, reveals a shortfall in reliability – which, in turn, renders it largely irrelevant for the purposes of judging Focus Research's consumer survey.

1. **Background of Focus Research study**

Kirsty Nunez, who founded Focus Research in 1991, has more than 25 years' experience in market research, including quantitative survey work and statistical analysis of survey data. She possesses graduate degrees in experimental psychology and biostatistics, and her professional specialization has for many years been custom research design.[2]

Typically, she and her assistants perform work commissioned by corporate vice presidents and directors of marketing, who rely on her conclusions to target market demographics, decide whether and where to expand businesses, and to gauge consumer preferences.[3] Focus Research's findings are used by market professionals to make business decisions – they are not tailored to audiences like judges and juries.

Prior to this case, as Ms. Nunez testified in deposition, she has not rendered trial testimony as a litigation consultant. She is not a professional expert – she is an expert professional. She has extensive formal education on research design and execution, as well as decades of experience in her field – not in the courtroom.

2. **Gabriel Gelb's own analysis does not satisfy the *Daubert* factors for reliable and relevant testimony**

---

[2] Nunez deposition, Exhibit A pp. 35-36
[3] Nunez deposition, Exhibit A pp. 25-26, 37-38

2

According to *Daubert* and its progeny, the district court "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).

Although Defendants characterize Mr. Gelb as an expert in "consumer surveying,"[4] neither his "professional studies" nor his "personal experience" betray expertise or experience outside litigation settings.

By Mr. Gelb's own admission, he relies upon (among other sources) Prof. Diamond's treatise *Reference Manual on Scientific Evidence*, published by the Federal Judicial College.[5] According to Prof. Diamond, experts who conduct and analyze surveys should have graduate training in psychology, sociology, marketing, communication sciences, statistics or a related discipline[6]; Mr. Gelb has none of this. According to that same treatise, survey experts "*must* demonstrate an understanding of survey methodology, including sampling, instrument design and statistical analysis"[7] (emphasis added).

Mr. Gelb testified that he has no academic training whatsoever in quantitative analysis, quantitative research (like the Focus Research survey), survey design or sampling.[8] He received a bachelor's degree in English and education[9], and went through a one-year journalism program at the University of Missouri. He never took a statistics class; never studied sampling, research methods, or quantitative research.[10]

Defendants' expert, Mr. Gelb, is by his own testimony not an expert in the relevant field, which is consumer survey research. Instead, he is an expert at offering expert testimony: "I am

---

[4] Rec. Doc. 75-1, p. 2
[5] Gelb deposition, Exhibit B p. 80; Rec. Doc. 67-6, p. 5
[6] Diamond, Exhibit C, p. 232
[7] Id.
[8] Gelb deposition, Exhibit B p. 15
[9] Gelb deposition, Exhibit B p. 5
[10] Gelb deposition, Exhibit B p. 7

exclusively into surveys for litigation or testimony about surveys that others have done or testifying where no survey is involved."[11]

Rather than the formal training which Mr. Gelb's own cited authorities indicate he must have – and which he lacks – he has "learned by doing"[12] in the course of long experience testifying in court. Indeed, when questioned about the bases of his own methodologies, he repeatedly referred not to relevant sources of authority but to his impressions of what would satisfy a court.

For example, in the course of discussing "probability" versus "non-probability" surveys, Mr. Gelb cited as demonstrating the scientific usefulness of a "non-probability" survey the conclusions of courts in litigation[13] – not, for example, any academic or research source. In fact, in deposition the most frequent grounding Mr. Gelb offered for his opinions was his conviction that he knows what it is courts want to hear.

Questioned concerning the appropriate survey "universe," Mr. Gelb relied on what he believes "[t]he courts have held," not on any source of authority within his claimed field.[14] According to Mr. Gelb, the "relevant population" for a survey like Focus Research's is defined not by sampling science but by what works in court: "[t]he relevant population as defined by innumerable courts have said…"[15]

Undersigned counsel asked Mr. Gelb why his report made certain assumptions, and he could respond only "that's what the courts have held."[16] Asked again and again for the reliable principles and methods forming the basis for his "expert" opinion on the relevant population for

---

[11] Gelb deposition, Exhibit B, p. 12
[12] Gelb deposition, Exhibit B, p. 15
[13] Gelb deposition, Exhibit B, p. 17
[14] Gelb deposition, Exhibit B, p. 48
[15] Gelb deposition, Exhibit B, p. 50
[16] Gelb deposition, Exhibit B, p. 65

the Focus Research survey, Mr. Gelb could only offer "[t]he courts have held that the relevant population…"[17]

When he was not citing court decisions as sources of scientific authority, Mr. Gelb's conclusions appeared to be based not on relevant literature but on his own unexplained assumptions.

When asked "are you saying the majority of grocery store shoppers in Louisiana and adjacent states neither are going to buy nor consider buying Cajun/Creole seasoning?" Mr. Gelb answered "That's my assumption." His rationale: "As a niche product, that defines [Cajun/Creole seasonings] as something that's not bought by a majority of shoppers."[18]

Mr. Gelb offered no justification whatsoever for the claim that Cajun and Creole seasonings are "not bought by a majority of shoppers" – he never himself conducted a survey investigating the question. His was not a scientific rationale – it was an assumption, for which Mr. Gelb could offer no explanation. Such assumptions are bare *ipse dixit*, and the Court need give them no weight.[19]

There is no doubting Mr. Gelb's long experience offering testimony in federal courts –in fact, he can offer essentially no foundation for his "expert" opinions other than his frequent appearances as an expert.

Defendants have demonstrated that Mr. Gelb possesses neither the "specialized knowledge" required to credit his opinion testimony, nor that his opinions are the product of "reliable principles and methods" applied to the facts. F.R.E. 702.

---

[17] Gelb deposition, Exhibit B, p. 89
[18] Gelb deposition, Exhibit B, p. 47
[19] *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *see Moore v. Ashland Chemical Inc.*, 151 F.3d 269, 277 (C.A.5, 1998)

5

### 3. Gabriel Gelb's long history of litigation work has resulted in questionable commentary on his expertise

Ironically, in light of the fact that Mr. Gelb's primary source of authority is not his education, training or professional literature, but his long experience in offering testimony, Mr. Gelb has at times been taken to task by the courts for offering opinions unjustified by the facts or less than useful to triers of fact.

In one Kansas case, for example, Mr. Gelb offered the opinion that a "high likelihood of confusion exists within the relevant population," but after a thorough analysis of his methodology and conclusions, the court concluded that "Gelb's survey sheds no light on whether the actual purchasers are confused regarding the source of the goods."[20] Among other criticisms of Mr. Gelb's own survey design, that court wondered "[t]he point of this question is not clear…"[21] and "[t]he record is not clear why Gelb only directed the follow-up survey to nurses who could not name the company which made or marketed Chlorascrub…"[22]

In 2009, a Texas district court considered surveys by Mr. Gelb and his counterpart opposing expert and concluded "[t]he parties have presented conflicting, inconclusive and ultimately unilluminating survey evidence…"[23] A Florida court in 2005 "afford[ed] only limited weight to the results of the Gelb survey," pointing to problems with Mr. Gelb's sampling, among other things.[24]

### 4. Gabriel Gelb's testimony is internally contradictory

---

[20] *Medi-Flex, Inc. v. Nice-Pak Products, Inc.*, 422 F.Supp.2d 1242, 1252 (D.Kansas, 2006)
[21] *Medi-Flex, supra,* at FN8
[22] *Medi-Flex, supra*, at FN9
[23] *Dallas Cowboys Football Club, Ltd. v. America's Team Properties, Inc.*, 616 F.Supp.2d 622, 641 (N.D.Texas, 2009
[24] *Tiger Direct, Inc. v. Apple Computer, Inc.*, 2005 WL 1458046 (S.D.Fla., 2005), "Order denying Plaintiff's emergency motion for preliminary injunction," unrep. in F.Supp.2d (attached as Exhibit D). Plaintiff cites the court's order not for precedential value but solely for its factual commentary on Mr. Gelb's survey offered in that case. *See Gray ex rel. Rudd v. Beverly Enterprises-Mississippi, Inc.*, 390 F.3d 400, 408 at FN7 (C.A.5, 2004).

According to Mr. Gelb, the "Cajun seasoning business is large enough to comprise a distinct market segment," and it "appears to be a product category that appeals to a measurable proportion of purchasers in Louisiana and adjacent states."[25]

Nevertheless, in order to conclude that "primary grocery shoppers" for a household is an insufficiently narrow survey sample, Mr. Gelb testified that what he termed a "niche product," like Cajun and Creole seasonings, are "not bought by a majority of shoppers."[26]

The degree to which Mr. Gelb needed to contradict himself in order to fault Focus Research's survey design is evident in the following exchange:

> Q. [T]he acceptance of this portion of your report depends on the assumption that the overwhelming majority of the sample, which consists in the proportion of 80 percent of people who do all or most of the grocery shopping for their household, the overwhelming majority of those people are neither actual nor prospective customers of Cajun seasoning. This is a sample largely in Louisiana. Is that your testimony?
> A. Yes.[27]

Accepting Mr. Gelb's premise, that an "overwhelming majority" of Louisiana grocery shoppers neither have nor will purchase Cajun seasoning, strains credulity. It also directly contradicts his own testimony that the market is "large enough to comprise a distinct market segment" that "appeals to a measurable proportion of purchasers in Louisiana."

C. **Focus Research's survey and conclusions do pass *Daubert* muster**

Even though Defendants' Motion is not predicated on testimony that itself is usefully reliable and relevant, Plaintiff out of an abundance of caution provides rebuttal of the Motion's substance. Drawing on Mr. Gelb's report, Defendants' pleadings attack the Focus Research survey on three principal grounds. Plaintiff addresses each in turn.

---

[25] Rec. Doc. 75-4, p. 5
[26] Gelb deposition, Exhibit B, p. 47
[27] Gelb deposition, Exhibit B, p. 74

7

1. **Focus Research's sample of grocery shoppers included the appropriate population**

According to Defendants, the "sample of grocery shoppers selected by Focus Research eliminates any probative value of the survey's results" (Rec. Doc. 75-1, p. 4). That is because, "as stated by Mr. Gelb," the appropriate population to be sampled is consumers of Cajun seasoning products, not simply grocery shoppers. Mr. Gelb's rationale, according to his report, is that

> [s]easoning-purchasing consumers, knowledgeable about these products and brands, would be *better equipped to differentiate between the brands* at issue…. A grocery shopper without familiarity with Cajun seasoning would, in my opinion, be *more likely to perceive an association between the two brands at issue based on the names* themselves… (Rec. Doc. 75-4) (emphasis added)

For Mr. Gelb, that is a problem – so he demands respondents who are "better equipped to differentiate between the brands at issue," and rejects those "more likely to perceive an association" between them.

If we take Mr. Gelb at his word, he is suggesting that the appropriate survey population is "Cajun-seasoning shoppers," not "grocery shoppers," *because* one group is more likely than the other to respond in a particular fashion – which happens to be detrimental to his client. Shoppers not previously familiar with seasoning brands are understandably more likely to *confuse* the "Slap Ya Mama" and "Punch Ya Daddy" brands – and for that reason, Mr. Gelb would like to exclude them from the survey.

Mr. Gelb's report appears to require, without even the pretense of scientific methodology, that the survey sample be biased in favor of Defendants.

At deposition, Plaintiff's counsel questioned this assertion of Mr. Gelb's – that Focus Research's survey was somehow required to bias its sample in favor of Defendants.

8

> Q. **Why are their perceptions of similarity or difference less reliable than those who have previously perceived the product?** Is someone who has never seen cans of Product A and Product B less able to pass judgment on their similarity or differences than someone who has seen them before? And why?
> A. **The courts have held that the relevant population are those who have purchased or might purchase the product**. They're not people who went in to buy milk, cheese, cookies. They have – they probably did not perceive Cajun seasoning unless they had some familiarity with it.
> Q. **I understand your testimony is the courts have accepted**. But **as a research marketing professional, what is the rationale** for discounting the perceptions of those consumers?
> A. Because they're not knowledgeable. You can't ask somebody about a product category they don't even know existed.
> Q. Why not?
> A. **Because the courts don't feel that's proper**.[28] (emphasis added)

"Might purchase the product," it must be noted, means "self-identifies as interested in purchasing the product" – meaning a self-selecting sample of consumers more likely than the typical shopper to be familiar with the products at issue and *less likely than the typical consumer to confuse them*.

Mr. Gelb could offer no scientific, rational, reliable explanation for his opinion – no explanation that has anything to do with his purported field of expertise, anyway. "Reliable principles and methods," as *Daubert* requires, have gone out the window when a proferred expert can offer no explanation whatsoever from his field of expertise for a crucial portion of his opinion.

As for the true jurisprudential rule on survey populations, as Defendants cite in their Memorandum, it is simply that "the persons interviewed must adequately represent the opinions which are relevant to the litigation."[29] Certainly, "grocery-store shoppers" do "adequately represent" the opinions of purchasers of grocery-store products.

In *Amstar*, the Court of Appeals enumerated a litany of survey problems which are largely inapplicable here: none of the surveyed cities had had the defendant's pizza franchise for

---
[28] Gelb deposition, Exhibit B, p. 89
[29] *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 264 (C.A.5, 1980)

9

more than three months (and most did not have one at all); and the survey consisted entirely of grocery-shopping women, and none of the single male college students who were defendant's target market. The court rejected the survey as having tested an absurdly inappropriate "universe."

There is no support whatsoever in *Amstar* for Mr. Gelb's claim that self-identified Cajun-seasoning buyers are the only appropriate survey population, versus household grocery shoppers, to gauge the similarities and differences among seasoning brands. Indeed, Mr. Gelb's report makes clear that he seeks respondents "better equipped to differentiate between the brands at issue;" and he seeks to avoid a grocery shopper "without familiarity with Cajun seasoning," *because* they are "more likely to perceive an association" between the brands at issue.

Focusing on self-identified consumers of particular products can, as common sense suggests, irretrievably bias a survey sample. For example, in *Sno-Wizard Mfg., Inc. v. Eisemann Products Co.*, 791 F.2d 423 (C.A.5, 1986), the Court of Appeals concluded that limiting a survey sample to self-identified purchasers of snowball machines resulted in a survey whose only meaningful conclusion was that "operators of snowball machines can identify the type of machine they use each day." 791 F.2d at 428.

Likewise, in *Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477 (C.A.5, 2004), the plaintiff commissioned a survey sampling exclusively owners of its own vacuums. The court found the survey essentially useless because it neglected "the class of potential consumers of new [vacuums], a class that includes a large proportion of persons who have not yet purchased" a vacuum. 381 F.3d at 488.

Quite recently, the Fifth Circuit recognized as settled precisely the issue Mr. Gelb contests: that it is "insufficient for a surveyor to identify individuals who meet certain criteria

10

that make them possible purchasers without determining whether they have an interest or willingness to purchase the products at issue."[30]

That, according to the *Honestech* panel, relying on *Sno-Wizard* and *Scott Fetzer*, is not the law. "This court has never required a surveyor to identify with mathematical precision the individuals who have a fixed intent to buy the relevant product; instead, it had merely required that the survey universe reflect a *fair sampling* of those purchasers most likely to partake of the alleged infringer's goods or services." *Honestech, supra*, 430 Fed.Appx. at 362 (emphasis in original; internal quotations omitted), quoting *Scott Fetzer*, 381 F.3d at 487-88.

In sum, the Fifth Circuit's dictates in *Sno-Wizard*, in *Scott Fetzer* and in *Honestech* demonstrate that surveyors need not, as Mr. Gelb demands, bias their samples by self-selection of consumers already familiar with the tested products.


2. **The Focus Research survey and its questions were not leading, and Gabriel Gelb's report actually misquotes the survey**

In his report critical of the Focus Research survey, Mr. Gelb quotes Prof. McCarthy's treatise[31] as finding it "improperly leading" to "imply that there could be a business relationship where the respondents may previously have not thought of any such connection."

As an example, Mr. Gelb misquotes what he calls the "key question in the Nunez survey," which appears at page 5 of the survey: "Using a scale of 1 to 5 where "1" means "strongly disagree" and "5" means "strongly agree," please indicate the extent to which you agree with the following statements about the names 'Slap Ya Mama' and 'Punch Ya Daddy'."

Not only does Mr. Gelb's report omit the crucial portion of the question – namely, that it asks respondents whether they either "strongly disagree" or "strongly agree" with the succeeding

---

[30] *Honestech, Inc. v. Sonic Solutions*, 430 Fed.Appx. 359, 361 (C.A.5, 2011)(unpub.) (attached as Exhibit E). Plaintiff cites that unpublished decision as reflecting established law under Fifth Circuit Rule 28.7, F.R.A.P. 32.1 and Fifth Circuit Rule 47.5.
[31] *McCarthy on Trademarks & Unfair Competition* (4th ed.)

11

statements – he inappropriately compares it to a "bad example"[32] from Prof. McCarthy's treatise to which it bears no resemblance.

Unlike Mr. Gelb's example, Focus Research did not ask if "there may or may not be a business connection" between two names. They were asked to indicate the extent to which they disagreed (and "disagree" was asked first) or agreed with a series of statements, with which they are free to do either. Mr. Gelb's accompanying criticism at deposition was "that's not the scale we use in litigation surveys" – a telling comment, since Defendants claim he is an expert at *consumer* surveys, not "litigation surveys."

Ironically, in deposition Mr. Gelb admitted that questions framed in a negative manner inevitably bias the respondent against finding an association between two compared items[33] - and the Focus Research survey's actual questions, unlike Mr. Gelb's misquotation, uniformly begin by offering the respondent the opportunity to "strongly disagree" with associations between the products. Prof. Diamond's treatise, too, describes a "primacy" effect – all else being equal, respondents tend to choose the first item mentioned.[34] In this case, that first item was uniformly "strongly disagree," making the actual results of the Focus Research survey – overwhelming consumer confusion – all the more striking.

Focus Research, in short, never asked respondents "whether Product A and Product B are similar" – they were asked to disagree or agree with a number of comparative statements. Mr. Gelb's report sets up a misquotation as a straw man, and his criticism as a result has no bearing on the value of Plaintiff's survey.

---

[32] McCarthy's example reads: "Do you think there may or may not be a business connection between Beneficial Capital Corp. and Beneficial Finance System Companies?" *McCarthy, supra*, 32:172 (4th ed.)
[33] Gelb deposition, Exhibit B, p. 33
[34] Diamond, Exhibit C, p. 249

3. **According to authorities cited by Defendants' own expert, no control group was appropriate for the Focus Research survey**

As Prof. Diamond's treatise indicates, only surveys designed to test causal propositions – not those intended simply to gauge consumer beliefs – require use of a control group. In her words, surveys which require controls "are intended to show how the trademark or content of the [advertisement] influences respondents' perceptions or understanding of a product or [advertisement]."[35]

Focus Research's study did not test any causal proposition – it did not test, for example, whether consumers purchased "Punch Ya Daddy" based on the mistaken belief that it was Plaintiff's product.

Instead, the survey sought to "describe consumer beliefs" – exactly the type of survey which Prof. Diamond's treatise indicates does not require a control group.[36] Even Defendants' expert conceded the survey was intended to test the "likelihood of confusion"[37] – not whether consumers had actually mistakenly purchased "Punch Ya Daddy" or "Slap Ya Mama," but whether based on their beliefs they would be likely to do so.

D. **Despite any purported methodological flaws in Focus Research's survey, such bear on the weight, not the admissibility, of survey evidence**

In the Fifth Circuit, technical inadequacies in a consumer survey – including format of the questions and the manner of its administration – bear on its weight, not its admissibility. *C.A. May Marine Supply Co. v. Brunswick Corp.*, 649 F.2d 1049 (C.A.5, 1981), *citing Holiday Inns, Inc. v. Holiday Out in America*, 481 F.2d 445, 447 (C.A.5, 1973): "the district court properly admitted the survey evidence in this case, leaving the format of the questions and the manner of conducting the survey for consideration as to the weight of this evidence."

---

[35] Diamond, Exhibit C, p. 249
[36] Id.
[37] Gelb deposition, Exhibit B, p. 56

13

Even when Mr. Gelb's own litigation survey work has been strongly criticized for under-inclusive sampling and for methodological flaws, in fact, one district court has recently concluded that "shaky but admissible" evidence may be adequately addressed by "vigorous cross-examination [and] presentation of contrary evidence…"[38]

In that case, Mr. Gelb faced attacks similar to those he levels against the Focus Research survey: "Gelb created a highly biased and underinclusive survey that cannot reliably be used.... Gelb's survey includes many other methodological deficiencies…."[39] Nevertheless, "the rejection of expert testimony is the exception rather than the rule," *National Western Life, supra*, and Mr. Gelb's testimony was admitted.

Even if the Court accepts some or all of Mr. Gelb's criticisms – and it should not – "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system."[40]

Defendants are free at trial to cross-examine Plaintiff's expert, Kirsty Nunez, on her extensive formal training in experimental psychology and biostatistics; her long experience in consumer research, marketing consultancy and statistical computation consulting. Defendants' expert, Mr. Gelb, is free to explain to the jury, if he can, the bases for his assumptions, his criticisms and his assertions, so long as he draws on his "scientific, technical, or other specialized knowledge" in the field of consumer survey work – and not on his layman's understanding of trademark jurisprudence.

Since "doubts about whether an expert's testimony will be useful should generally be resolved in favor of admissibility,"[41] the jury should have the opportunity to weigh both Mr.

---

[38] *National Western Life Ins. Co. v. Western Nat. Life Ins. Co.*, 2011 WL 692976, Order on *Daubert* Motions (W.D.Texas 2011) (slip. op.) (attached as Exhibit F)
[39] *National Western Life, supra*, Defendants' Motion and Integrated Memorandum under Federal Rule of Evidence 702 to Exclude Plaintiff's Expert Gabriel Gelb (attached as Exhibit G)
[40] *U.S. v. 14.38 Acres of Land, More or Less Situated in Leflore County, State of Miss.*, 80 F.3d 1074, 1078 (C.A.5, 1996), quoting *Daubert, supra*.

Gelb's and Ms. Nunez' testimony. "Who ever knew truth put to the worse, in a free and open encounter?"

The Motion should be denied.

Respectfully submitted,

__/s/ Ryan Goudelocke_____
William W. Stagg, T.A. (No. 1613)
Ryan M. Goudelocke (No. 30525)
*Durio, McGoffin, Stagg & Ackermann*
220 Heymann Boulevard, Lafayette, LA  70503
Post Office Box 51308, Lafayette, LA  70505
Telephone: (337) 233-0300
Fax: (337) 233-0694
*Counsel for Walker & Sons, Inc.*

**CERTIFICATE OF SERVICE**

I certify that I have, this 17th day of January, 2012, provided all parties with a copy of the foregoing pleading by means of the Western District's CM/ECF electronic filing system.

_____/s/ Ryan M. Goudelocke_____
Ryan M. Goudelocke

---

[41] J. Weinstein & M. Berger, *Weinstein's Evidence,* para. 702[02] at 702-30 (1988)